Betty Jean KITCHENS, Plaintiff,

v.

LIBERTY MUTUAL INSURANCE
COMPANY, Defendant.

Civ. A. No. H85–0367(NG).

United States District Court,
S.D. Mississippi,
Hattiesburg Division.

April 2, 1987.

John M. Deakle, Hattiesburg, Miss., for plaintiff.

Thomas E. Vaughn, Gulfport, Miss., for defendant.

## MEMORANDUM OPINION

GEX, District Judge.

### I. Procedural History

On June 10, 1983, Betty Jean Kitchens allegedly sustained an injury to her lower back during the course and scope of her employment with Marshall Durbin Company in Hattiesburg, Mississippi. After said injury, Mrs. Kitchens began receiving temporary total disability worker's compensation benefits from Liberty Mutual Insurance Company (Liberty Mutual), Durbin's compensation carrier. Liberty Mutual, however, suspended her compensation payment on November 30, 1983, claiming Mrs. Kitchens had been released by her treating physician to return to work. Mrs. Kitchens, through counsel, attempted to have her compensation benefits reinstated without an award, but all efforts were futile. A motion to controvert was filed with the Worker's Compensation Commission on behalf of Mrs. Kitchens on January 20, 1984. A hearing before an Administrative Law Judge held on July 25, 1984, resulted in Mrs. Kitchens' benefits being ordered reactivated on September 28, 1985. Liberty Mutual Insurance Company sought review of the administrative judge's order before the Mississippi Worker's Compensation Commission. Mrs. Kitchens filed the instant action for bad faith arising out of the alleged wrongful termination of benefits. With respect to Liberty Mutual's administrative review before the Commission, the administrative judge's order was affirmed on April 25, 1987, and the carrier and the employer presently have pending an appeal of the Commission's decision before the Circuit Court of Forrest County, Mississippi. Mrs. Kitchens' action is presently before this Court on Defendant Liberty Mutual's Motion for Summary Judgment.

### II. Facts

The specifics of Mrs. Kitchens medical history and Liberty Mutual's handling of her claim were as follows. Shortly after her June 10, 1983, injury, Mrs. Kitchens consulted her family physician, Dr. Donald Conerly. Dr. Conerly addressed Mrs. Kitchens' back pain conservatively with medication and activity restrictions, however, her complaints did not abate and Dr. Conerly referred Plaintiff to Dr. Bruce McCarthy, an orthopedic surgeon. Dr. McCarthy's initial impression of Mrs.

Kitchens' condition, rendered June 29, 1983, was that Plaintiff was "probably on her way to recovery from a herniated nucleus pulposus"; he recommended bed rest for a two-week period to be followed by an office visit. At some point during his course of treatment, Dr. McCarthy sought a neurological consult on Mrs. Kitchens from Dr. Ralph Wicker. Mrs. Kitchens' complaint of pain continued through early October of 1983 when Dr. McCarthy opined that Mrs. Kitchens needed "to be on a more vigorous physical therapy regimen" and Dr. Wicker determined to "give her an appointment to see Dr. Hartwig of the Neurology Service for a second opinion." Both Dr. McCarthy and Dr. Wicker anticipated that Mrs. Kitchens would be able to resume some work activity in early November of 1983. The Plaintiff did not, in fact, return to work that November, and was seen by Dr. Wicker on November 29, 1983, at which time he concluded, after reviewing the neurological tests performed by Dr. Hartwig's office and the Plaintiff's CATT scan and myelogram and conducting a physical examination of Mrs. Kitchens, that she had neither a ruptured intervertebral disc nor nerve root entrapment and determined to discharge the Plaintiff from his care. On December 14, 1983, Dr. McCarthy submitted his final medical report on Mrs. Kitchens to both Liberty Mutual and the Worker's Compensation Commission wherein he deferred to Dr. Wicker's reports as being indicative of Mrs. Kitchens' date of discharge as cured, if any, and physical limitations as a result of her injury, if any. Based upon Dr. Wicker's November 29, 1983, report, Liberty Mutual suspended Mrs. Kitchens' compensation benefits on November 30, 1983, by filing Form B–16, Notice to Employee of Suspension of Payment, with the Worker's Compensation Commission and forwarding a copy to Mrs. Kitchens. Mrs. Kitchens then went to Dr. Donald Cook, and orthopedic surgeon on January 4, 1984. Dr. Cook examined Mrs. Kitchens, reviewed her x-rays, myelogram and CATT scan and concluded that the Plaintiff had suffered a "stage II discogenic disorder, L4–L5 with traumatic precipitation" and, as a result

incurred "a residual medical impairment of function of 5% of the total body as a whole." Liberty Mutual declined to reinstate Mrs. Kitchens' benefits based upon Dr. Cook's report; the instant action and the parallel state administrative proceedings ensued.

III. Legal Analysis

The thrust of Mrs. Kitchens' claim as set forth in her complaint against Liberty Mutual is that:

1. her worker's compensation benefits were terminated without arguable reason; and,

2. her worker's compensation benefits were terminated contrary to Section 71–3–7(b) of the Mississippi Code. The procedural posture in which this cause has come before the Court, however, raises an overriding legal question. Initially, the Court should determine what effect, if any, the Plaintiff's election to pursue her administrative remedies under the Mississippi Worker's Compensation Act has on the maintenance of this suit in federal court.

The Mississippi Supreme Court has unequivocally recognized the right of an injured employee to maintain a civil action against his employer and/or its compensation carrier for bad faith refusal to pay worker's compensation benefits. *See, Luckett v. Mississippi Wood, Inc.,* 481 So.2d 288, 290 (Miss.1985); *Southern Farm Bureau Cas. Ins. v. Holland,* 469 So.2d 55, 58 (Miss.1984). Unfortunately, the cause of action is so new in Mississippi jurisprudence that the question of the effect of a pending administrative dispute initiated by the employee over his rights to statutory benefits on the viability of a civil action seeking an adjudication of both the employee's right to statutory benefits and his claim for punitive damages based on the carrier/employer's bad faith conduct has not been addressed. Nonetheless, the Mississippi Supreme Court's most recent opinion on the subject has laid the predicate to this issue. In *McCain v. Northwestern National Ins. Co.,* 484 So.2d 1001 (Miss.1986), Justice Prather wrote:

Punitive damages are recoverable for breach of a contract when such an action constitutes the commission of an independent tort ... *A prerequisite to the award of punitive damage is the determination that the plaintiff is entitled to contractual damages.* A severance of the two issues of contract damage and punitive damage ... can be utilized to prevent prejudice to the defendant insurance company ....

*Id.* at 1002 (citations omitted) (emphasis added).

This Court must therefore interpret existing precedent in relation to the issue raised and render its prediction of the Mississippi Supreme Court's probable resolution of the matter accordingly. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 71–73, 58 S.Ct. 817, 818–819, 82 L.Ed. 1188 (1938).

The problem presented then is that of the possibility of inconsistent determinations on the underlying contract question/right to compensation benefits. It is frighteningly conceivable that a jury in this civil action could find for the employee on the compensation issue and then assess a punitive award against the defendant carrier for bad faith conduct only to have plaintiff's administrative claim, which is now on appeal by the carrier before the Circuit Court of Forrest County, result in a finding in favor of the carrier on the compensation issue. The matter essentially boils down to the question would the Mississippi Supreme Court require exhaustion of administrative remedies on the underlying compensation benefits questions before the filing of a common law bad faith action against a compensation carrier and/or employer when the *employee initiates administrative proceedings prior to commencing the bad faith suit?*

Thorough research on this issue has revealed only one case that has addressed the question. In *Travelers Insurance Co. v. Savio,* 706 P.2d 1258 (Colo.1985), the insurance company raised the question whether Savio had to exhaust the administrative remedies provided under the Worker's Compensation Act of Colorado before seeking relief in a civil action on a bad faith claim against his employer's carrier. In rejecting Travelers' claim, the court noted that the Colorado Compensation Act did not provide for or suggest any limitation on the remedies available for bad faith handling of a claim for compensation by a carrier. *Id.* at 1265. The observation was made that a claim for bad faith basically asserts a breach of the duty of good faith that exist as a result of the contractual relationship between an insured third-party beneficiary/claimant and the provider of insurance benefits resulting in lost income, mental distress, and attorney fees for which recompense must be had in a court of law. *Id.* at 1266–68. The court then concluded that:

The concern that permitting state court tort actions to proceed will produce serious and manifold *conflicts between rulings of courts of law and worker's compensation agencies arises only when the same legal issue is committed to both systems for resolution.* Such overlap does not exist between our statutes and the tort of bad faith. The right to compensation depends on the resolution of specific factual and legal issues between carriers and claimants. Whether in a particular case disputes involving these issues are entertained in good faith presents a related, but quite different question, the resolution of which does not depend on the validity of the underlying compensation claim.

*Id.* at 1270 (emphasis added).

Applying the principles set forth by the Supreme Court of Colorado to the exhaustion question as it relates to the bad faith tort in the worker's compensation context as recognized by the Mississippi Supreme Court, the Court finds that, because in Mississippi "the same legal issue", i.e. the right to compensation benefits, is committed to both the trier of fact in a bad faith tort action and the administrative fact finder under the Act *and* the resolution of the bad faith claim is totally dependent on "the validity of the underlying compensation claim", *McCain,* 484 So.2d at 1002, the Mississippi Supreme Court would require exhaustion of administrative remedies on the underlying compensation issue where

the plaintiff has initiated administrative proceedings prior to filing a bad faith tort action. The Court's ruling is limited to those situations where the injured claimant institutes administrative proceedings and subsequently files a bad faith claim prior to the final conclusion of the administrative process. If the administrative process is terminated at some point, *see Holland,* 469 So.2d at 56 (carrier resumed payment of benefits after commission's order rather than filing appeal), then no exhaustion of administrative remedies requirement exist. The Court's findings on this issue make it unnecessary to address the issues raised in Defendant's summary judgment motion at this time.

## IV. Conclusions

Based on the foregoing legal principles, the Court concludes that the Defendant's Motion for Summary Judgment should be denied, but that the Plaintiff's Complaint should be dismissed without prejudice pending final resolution of the Plaintiff's administrative claim for underlying compensation benefits. An order consistent with the Court's Memorandum Opinion shall be submitted by Defendant within ten (10) days of the date hereof.